UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

STEVEN L. SCHMID,                                    CIVIL NO.  11-784 (DWF/JSM)

          Plaintiff,

v.                                                   REPORT AND RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

          Defendant.


          The above matter is before the undersigned United States Magistrate Judge on

plaintiff's Motion for Summary Judgment [Docket No. 16] and defendant's Motion for

Summary Judgment [Docket No. 21].  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation by the District Court pursuant to

28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).  Plaintiff is represented by Frank W.

Levin, Esq.; defendant is represented by Lonnie F. Bryan, Assistant United States

Attorney.

          For the reasons discussed below, it is recommended that plaintiff's Motion for

Summary Judgment be **DENIED** and that defendant's Motion for Summary Judgment

be **GRANTED**.

## I.     PROCEDURAL BACKGROUND

          Plaintiff Steven L. Schmid ("Schmid") filed his applications for disability insurance

benefits and supplemental security income on January 17, 2007, alleging a disability

that began on January 1, 2006.  Tr. 18, 119-33.   Schmid's applications were denied

initially and upon reconsideration.  Tr. 62-87.  At Schmid's request, an administrative

1

hearing was held on August 4, 2009, before Administrative Law Judge ("ALJ") Michael D. Quayle.   Tr. 18, 42-61.   Schmid was represented by a non-attorney representative during the hearing.   Id.   Testimony was taken at the hearing from a vocational expert ("VE"), Norman A. Mastbaum, and from Schmid.   Id.   On October 9, 2009, the ALJ issued a decision denying disability benefits.   Tr. 18-26.   Schmid filed a request for review of the ALJ's decision with the Appeals Council and the Appeals Council denied Schmid's request for review and upheld the ALJ's decision denying disability insurance benefits to Schmid, (Tr. 1-3), making the ALJ's findings the final decision of defendant.   See 42 U.S.C. § 405(g).

Schmid has sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).   [Docket No. 1].   The parties now appear before the Court on plaintiff's Motion for Summary Judgment [Docket No. 16] and defendant's Motion for Summary Judgment [Docket No. 21].

## II.   PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.   "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."   Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); 42 U.S.C. § 1382(a).   The Social Security Administration ("SSA") shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."   42 U.S.C. § 1382c(a)(3)(A).   The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The impairment must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

### A. Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.907-09, 416.1407-09. A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. § 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429. To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's impairment, residual functional capacity, past work, age, education and work experience. See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727. The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

**B.**   **Appeals Council Review**

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-404.982, 416.1467-1482.   The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

**C.**   **Judicial Review**

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1.  The credibility findings made by the ALJ;

2.  The plaintiff's vocational factors;

3.  The medical evidence from treating and consulting physicians;

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.  Any corroboration by third parties of plaintiff's impairments;

6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.2d 1113, 1115 (8th Cir. 2008); Johnston v. Apfel,

210 F.3d 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996). "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole." Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and

apply a balancing test to evidence which is contradictory." Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.   See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).   Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity.   See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

## III.   DECISION UNDER REVIEW

The ALJ concluded that Schmid was not entitled to disability insurance benefits under §§ 216(i) and 223(d) of the Social Security Act, and that he was not entitled to supplemental security income under § 1614(a)(3)(A) of the Social Security Act.   Tr. 26. In reaching this determination and applying the five-step process, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since January 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3. The claimant has the following severe impairments:   Human Immunodeficiency Virus (HIV), Bipolar Disorder, and History of Cerbrovascular incident (CVA or "stroke") (20 CFR 404.1520(c), and 416.920(c)).

6

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526. 416.920(d), 416.925 and 416.926).

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except performing only routine and repetitive tasks, in a low stress environment, with only brief and superficial contact with others in a job where claimant will not be exposed to sharp objects.

6. The claimant is able to perform past relevant work as a lot attendant and courier.  This work does not require the performance of work related activities precluded by claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, at any time from January 1, 2006 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. 20-26.

## IV.    THE RECORD

Schmid was 41 years old at the time of the hearing and the ALJ's decision. Tr. 44.  Schmid attended high school through twelfth grade, but did not graduate due to school absences.  Tr. 44, 563.  His past employment included waiter, lot attendant, owning his own cleaning business and courier.  Tr. 25, 48, 50, 53-54 180.

### A.    Medical Records

In August 24, 2006, Schmid was diagnosed as HIV positive with signs of an advanced disease indicated by a low white blood cell count.  Tr. 327-328.  On September 6, 2006, Dr. Reuben N. Lubka, M.D. noted that Schmid had advanced HIV with a centralized feeling of muscle fatigue and a general sense of fatigue.  Tr. 324. Dr. Lubka believed that Schmid met the criteria to receive assistance from the Minnesota Department of Human Services.  Tr. 324.

7

On September 27, 2006, testing showed that Schmid had a high viral load count with a low number of white blood cells, but that the virus was showing sensitivity to the antiviral drugs tested.  Tr. 323.

In September 6, 2006, Dr. Lubka filled out a medical opinion form finding that Schmid had very advancing HIV and he was unsure when Schmid could return to performing limited work.  Tr. 1150.

In October 31, 2006, Dr. Lubka filled out a medical opinion form finding that Schmid had very advancing HIV and that he would not be able to perform work in the foreseeable future.  Tr. 1117, 1152.

On January 9, 2007, Schmid presented with headaches.  Dr. Lubka indicated that an MRI would be taken of his brain to determine if he had suffered a stroke, Schmid was tolerating his HIV medications, and he was showing signs of immune response reconstitution.  Tr. 319-20.

On January 11, 2007, Schmid presented himself as having a panic attack and a hard time focusing his thoughts.  Tr. 941.  The diagnosis was headaches and high blood pressure.  Tr. 938-41.

On January 16, 2007, Dr. Roberta Ricart, M.D. determined that the MRI of Schmid's brain showed signs of two old strokes.  Tr. 317.  Dr. Ricart also noted that Schmid's HIV viral load was undetectable, his CD4 white blood counts were elevated, which meant that the HIV infection appeared to be under control with the medications. Id.  During the consultation, Schmid began crying due to stress caused by his HIV infection, the fact that his sister had asked him to leave her house and because he had been stopped by the police due to a warrant for his arrest.  Id.

On January 19, 2007, Schmid was evaluated by Dr. Ana Groeschel, M.D. for migraine headaches. Tr. 377. During her neurological examination, Dr. Groeschel noted that Schmid was alert, attentive, orientated, cooperative and not in any acute distress; was aware of current events; his judgment, insight and fund of knowledge was fair; he was tangential at times and appeared to be quite forgetful; and his mood and affect appeared to be stable. Tr. 378. Dr. Groeschel believed that Schmid's migraines were probably due to increased blood pressure. Tr. 379.

On January 23, 2007, Schmid was admitted to the emergency room at Abbott Northwestern Hospital. Tr. 288. He was assessed with possible acute mania. Tr. 288-89. Schmid appeared to be in no acute distress, was orientated to person, time and place, his insight and judgment were poor, his eye contact was fair, and his speech was at an increased rate but with no paranoia or delusional thinking. Tr. 287. The impression was that Schmid was suffering from a mood disorder, not otherwise specified, but doctors wanted to rule out an organic mood disorder and bipolar affective disorder. Id. Schmid expressed his desire to go home, however, doctors did not believe this was optimal. Tr. 287.

Once he had been admitted to the psychiatric unit, Schmid was placed on Seroquel to help with his mood fluctuation. Tr. 284. Schmid reported that the Seroquel helped him sleep. Id. Schmid then refused to take Seroquel. Id. The night of January 25, 2007, Schmid asked to leave. Id. The next morning, Schmid again conveyed his desire to leave the hospital and remained slightly hypomanic when told about staying at the hospital and taking Seroquel on a regular basis. Id. Schmid was discharged against doctor's advice. Id. The discharge diagnosis was as follows:

Axis 1:  1.  Bipolar affective disorder, hypomanic episode.
              2.  Nicotine dependence.
              3.  Rule out opioid abuse.
Axis:     Rule out personality disorder, not otherwise
          specified (NOS)
Axis III:  1.  Human immunodeficiency virus (HIV)
              2.  Essential Hypertension
Axis IV:  Level of Stress 4
Axis V:  Global assessment of functioning: 10 on admission,
          30 on discharge.

Tr. 283-84.  Schmid was given a prescription for Seroquel and told to follow-up with his physicians.  Tr. 284.  Schmid stated he was going to go to Anoka County to apply for social security disability benefits.  Id.

From January 26, 2007 through January 31, 2007, Schmid was seen by Riverwind Crisis Services.  Staff at Riverwind Crisis Services reported Schmid as showing manic symptoms and reluctant to take Seroquel.  Tr. 297-302.  On February 1, 2007, staff reported that Schmid appeared to be at "baseline," was "a lot less manic and was sleeping more, most likely due to the administration of his Seroquel."  Tr. 303-04.  Thereafter, the records at Riverwind Crisis Services showed that Schmid had stabilized, he appeared upbeat and that his manic behaviors had decreased.  Tr. 305-07.  Schmid was discharged from Riverwind Crisis Services on February 6, 2007.  Tr. 307.

On February 2, 2007, Schmid saw Dr. Ricart in a follow-up appointment.  Schmid was taking Seroquel and stated that he was feeling "much better."  Tr. 310.  Dr. Ricart noted that Schmid appeared to have a calmer demeanor.  Id.  Dr. Ricart went over the medications Schmid was taking to control his HIV, Truvada and Efavirenz.  Id. Dr. Ricart indicated that these medications had some psychiatric side effects, but they usually occurred upon commencement of taking the medication and got better over time.  Id.  Dr. Ricart did not believe that Schmid's psychiatric issues were caused by the

10

medications, however, he noted that they would monitor his condition and make changes if needed.  Id.  Schmid saw Dr. Lubka on the same day, and told him that Seroquel was helping him deal with his bipolar disorder and he believed that things were starting to settle down for him.  Tr. 312.

On February 16, 2007, Schmid was seen by therapist Robert N. Wilson, Ph.D. L.P. due to his recent "nervous breakdown."  Tr. 382.  Dr. Wilson indicated that Schmid had been previously diagnosed with bipolar disorder, hypomanic episode.  Id. Dr. Wilson noted that Schmid appeared well groomed, had a cooperative attitude, appeared to be in a comfortable mood, showed an appropriate affect, had normal speech, intact thought, no problems with perception, and calmer motor functions, orientated x 3 cognitively, showed average intelligence, and had age appropriate insight.  Id.  Schmid was diagnosed with bipolar disorder, hypomanic episode.  Id. Dr. Wilson indicated that Schmid's psycho-social stressors included that he claimed disability, he was homeless, was on general assistance, and was going to court for a driving ticket.  Id.  Dr. Wilson assigned Schmid with a GAF score of 45.[1]  Id.  Dr. Wilson

---

[1]     The GAF scale is used to assess an individual's overall level of functioning. See Jones v. Barnhart, 345 F.3d 661, 662 n. 2 (8th Cir. 2003) (citing the Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 2000 Revision)). The lower the score, the more serious the individual's symptoms. See id. "GAF scores of 51–60 indicate 'moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" Id. GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 2000 Revision).  A GAF score of 20-30 indicates an individual's behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). Id.  At the low end of the GAF scale, a

noted that Schmid was taking Seroquel.  Tr. 383.  Dr. Wilson stated that the goals for Schmid were to reduce his stress, determine a positive purpose for his life, build positive self-esteem, and network with community support services.  Tr. 384.

On February 21, 2007, Schmid had a counseling session with Dr. Wilson, at which time he expressed worry and anxiety about his situation.  Tr. 545.  Dr. Wilson noted that Schmid reported still coming down off the threat of death and that he sounded great.

On April 11, 2007, Schmid saw Michael G. Saribalas, D.O. at the Allina Mental Health Clinic.[2]  Dr. Saribalas noted that Schmid was feeling somewhat better than his last visit.  Tr. 956.  Schmid denied any suicidal thoughts or hallucinations.  Tr. 956-55.  Schmid stated that "he is not too bad."  Tr. 955.  Dr. Saribalas indicated that Schmid was alert and orientated x 3, his mood was just slightly depressed, his affect was bit flat, he had no delusions or abnormal thoughts, his speech was decreased in rate and volume and somewhat slow, he had fair eye contact, showed no flight of ideas, had a thought processes that were somewhat goal orientated and organized, demonstrated fair insight and judgment, exhibited poor memory and a poor attention span.  Tr. 955.

---

person with a GAF score of 10 to 1 indicates "[p]ersistent danger of hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death." Id.

[2]      "D.O." refers to Doctor of Osteopathic medicine, which is a "is a physician licensed to practice medicine, perform surgery, and prescribe medication." http://www.nlm.nih.gov/medlineplus/ency/article/002020.htm.  "Osteopathic medicine is dedicated to treating and healing the patient as a whole, rather than focusing on one system or body part." Id.  Schmid referred to Dr. Saribalas as a psychiatrist.  See Pl.'s Mem., p. 6.

Dr. Saribalas diagnosed Schmid with bipolar disorder and personality disorder, NOS. Tr. 954.   Dr. Saribalas instructed Schmid to continue taking his current medication regimen, as he seemed stable.   Id.

On April 13, 2007, a state agency psychiatric review of Schmid's medical records was conducted by W. Shipley.   Tr. 471.   Shipley determined that Schmid's bipolar disorder was not a severe impairment, and that   Schmid exhibited a mild degree of limitation to activities of daily living, social functioning, concentration, persistence or pace, and no episodes of decompensation.   Tr. 471, 474, 481.   These determinations were based on the fact that Schmid was diagnosed with bipolar disorder after a hypomanic episode in February 2007, he had recovered from this episode and was back to baseline, and he was able to engage in wide range of tasks without difficulty, including focus on television, clean, do laundry, use public transportation, shop, pay bills, play games, and attend church.   Tr. 483.   Shipley also indicated that Schmid got along socially with others, tolerated casual interaction necessary to perform tasks, and had a long work history.   Id.   Shipley determined that Schmid's concentration and attention were intact, he appeared cognitively intact, and appeared to have the cognitive abilities and concentration needed to complete tasks, make work related decisions, remember locations and work like procedures.   Id.   To the extent that Schmid's activities of daily living were limited, Shipley indicated they were due to physical issues.   Id. Shipley opined that Schmid was capable of maintaining a schedule with limitations in energy levels due to his HIV status.   Id.

Between April 23 to May 5, 2007, state agency physicians determined that Schmid's HIV, chronic low back pain, migraines and past strokes were not severe or disabling impairments.  Tr. 496-98.

On April 18, 2007, Schmid saw Dr. Wilson.  Dr. Wilson indicated that Schmid appeared to be proactive and sounded better.  Tr. 540.  In addition, Dr. Wilson noted that Schmid was going to church that night and that he was swimming and stretching in a pool at Lifetime Fitness.  Id.

On April 20, 2007, the Minnesota Department of Human Services determined Schmid was disabled for the period of January 1, 2007 through January 1, 2008, for the purposes of establishing eligibility for medical assistance.  Tr. 1068.

On May 9, 2007, Schmid saw Dr. Wilson.  Dr. Wilson reported that Schmid "looked good + sounds great."  Tr. 539.  Dr. Wilson also noted that Schmid was "antsy" to get on with his life and reported being bored.  Id.

On May 29, 2007, Schmid was seen by Dr. Frank Rhame, M.D. for HIV treatment.  Tr. 559, 889.  Dr. Rhame noted that when Schmid was first diagnosed, his CD4 level counts were less than 20 and he had a viral load RNA level of 500,000.  Tr. 559.  As of April 30, 2007, his CD4 count was 103 and his viral load was less than 75.  Id.  Schmid was experiencing no difficulty from taking his antiviral medications.  Id.  Schmid was taking Atovaquone and Azithromycin as a prophylaxis against infection.  Id.  Dr. Rhame indicated that Schmid had been diagnosed with bipolar disorder, he was taking the Seroquel and was also seeing a psychologist.  Id.  Dr. Rhame's examination of Schmid showed that his affect was dulled but that he was lucid and cooperative.  Tr. 560.  Dr. Rhame's impression was that Schmid had an advanced HIV infection that

was now under control, bipolar disorder, hypertension under control and a history of strokes.  Id.  Dr. Rhame discontinued the Azithromycin, as Schmid's CD4 count was above 100 and indicated that he would continue the Atovaquone until Schmid's levels reached above 200.  Id.

On June 21, 2007, Schmid was seen by Dr. Saribalas for a follow-up appointment.  Tr. 719.  Schmid reported that his mood was labile[3] and he felt depressed.  Id.  Schmid did not appear to be in any acute distress, he was alert and orientated x 3, his mood was dysphoric,[4] his affect was labile and tearful on occasion, he exhibited decreased speech tone and rate, no delusions or hallucinations, and no manic or hypomanic symptoms.  Id.  Further, Schmid exhibited fair insight and good eye contact.  Id.  Dr. Saribalas increased Schmid's dosage of Seroquel and Neurontin in order to stabilize his mood.  Id.

On July 3, 2007, Schmid had a psychological consultation with Dr. Donald E. Wiger, PhD., L.P.  Tr. 563-64.  Schmid stated that he spent $5500 per month on medications and therefore he needed health insurance and that he needed case management services in order to get housing and insurance.  Tr. 563.  Schmid reported that he did not watch much television, he was often at doctor appointments, he often goes to the library to read up on bipolar issues, and he kept busy trying to find a house and taking care of his health issues.  Tr. 564.  Schmid indicated that while others had been cooking for him in the last three months, he was able to cook.  Id.  Schmid was

---

[3]     Labile:  "[D]enoting free and uncontrolled mood or behavioral expression of of the emotions." Steadman's Medical Dictionary, p. 554 (27th Ed. 2000)

[4]     Dysphoria: A mood of general dissatisfaction, restlessness, depression and anxiety." Steadman's Medical Dictionary, p. 554 (27th Ed. 2000)

also able to dress, bathe and groom himself.  Id.  On a typical day, Schmid woke up at 6:00 a.m., had breakfast, performed personal hygiene, took his medication, and went to doctor appointments or to the library.  Id.  In the evening, Schmid read about bipolar disorder and watched television.  Id.  Schmid went to bed at about midnight and got 4 to 5 hours of sleep per night.  Id.  Schmid reported that he got along with other people "pretty good" and that he had friends in both Wisconsin and Indiana.  Id.

Dr. Wiger reported that Schmid was adequately groomed and his appearance indicated that he was healthy; his gait and eye contact were normal; his speech was within normal limits for vocabulary, details and understandability; his attitude was friendly and cooperative; and he showed decreased affect.  Tr. 564-65.  When asked about his typical mood, Schmid stated that he was often depressed, had bouts of hypomanic behaviors, with problems with sleep, fatigue, psychomotor retardation, decreased self-esteem, talkativeness, rapid speech and flight of ideas and setting goals.  Tr. 565.  At the end of the interview, Schmid reported feeling better and that he wanted to go work, but that he was trying to work on his health.  Id.

Dr. Wiger opined that Schmid's symptoms were consistent Bipolar II disorder.  Tr. 565.  Dr. Wiger also opined that Schmid did not have any thought disorder, and no concerns were noted regarding the quality of speech and thought, as Schmid was coherent, logical, goal-directed, and relevant.  Id.  Also, there were no concerns regarding obsessions, compulsions, suicidality, hallucinations, illusions or delusions.  Id.  Schmid was in touch with reality, was orientated x 3 and his attention and concentration were within normal limits.  Id.  Further, Schmid showed adequate memory, was in touch

with current events, had adequate judgment and no evidence of a somatoform or personality disorder.  Id.

Dr. Wiger diagnosed Schmid as follows:

**Axis I:**    Bipolar II

**Axis II:**   No diagnosis

**Axis III:**  History of HIV positive

**Axis IV:**   Physical stressors

                      Homelessness

                      Financial stressors

**Axis V:**    GAF= 49

Tr. 566.

Dr. Wiger opined that Schmid was able to understand directions, could carry out mental tasks with reasonable persistence and pace, could handle money, responded well towards other people, and would have many difficulties handling the stressors of the workplace.  Id.

On July 9, 2007, Schmid saw Dr. Rhame for a periodic HIV follow-up.  Tr. 866. Schmid reported that he had experienced no side effects from his medications, except what he characterized as weight gain due to taking Seroquel.  Tr. 866-67.  On July 17, 2007, test results for Schmid revealed no HIV-1 RNA was present, he had less than 50 copies per milliliter using sensitive testing, and that his CD4 levels were at 237.  Tr. 568.

On July 19, 2007, state agency physiologist Sharon Frederickson, Ph.D., L.P. conducted a psychiatric medical records review of Schmid.  Tr. 640-660. Dr. Frederiksen was asked to address the Dr. Wiger's opinion regarding Schmid's ability

17

to handle stressors in the workplace, in light of the initial state agency review which indicated that Schmid's psychological issues from early 2007 were resolving, he was engaged in a wide range of activities of daily living and his condition was non-severe, and the reports from Schmid's therapist stating that he was doing well and appeared to be involved in routine activities and more.  Tr. 642.

Based on her review of the records, Dr. Frederiksen indicated that Schmid had a recent diagnosis of bipolar disorder and that he had a good response to medications. Tr. 646.  Dr. Frederiksen rated Schmid's functional limitations as follows: mild limitations to activities of daily living; mild to moderate limitations to social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation.  Tr. 653.  With respect to Dr. Wiger's evaluation, Dr. Frederiksen summarized his report and indicated that his medical source statement noted some limitations, "but does not rule out all work, may have difficulties with stressors of work place [or may not have]."  Tr. 655.

In summary, Dr. Frederiksen stated that Schmid's mental health symptoms were improving and stabilizing nicely with the use of medication, he had few overt symptoms at the time of the consultative examination with Dr. Wiger, and while he had reported mood swings to Dr. Wiger, there were no medical records to verify these swings, except for his hospitalization in January 2007.  Id.  According to Dr. Frederiksen, Schmid's primary limitations appeared to be physical in nature, given that his cognition was intact, he interacted with others daily, had some interests and saw his relatives.  Id.

On the mental residual functional capacity assessment, Dr. Frederiksen concluded that Schmid did not have significant limitations in understanding and memory

or sustained concentration (except for a moderate limitation in the area of maintaining a regular schedule); he was not significantly limited in asking questions, seeking assistance, getting along with co-workers and in maintaining socially appropriate behavior; he was moderately limited in the area accepting instruction and responding to criticism from supervisors appropriately; and he had no significant limitation in adaptation (except for a moderate limitation to his ability to respond appropriately to changes in the work setting). Tr. 657-58.

Dr. Frederiksen assigned the following RFC for Schmid:

> Claimant retains sufficient mental capacity to concentrate on, understand, and remember routine, 3-4 step, and detailed instructions, but would be markedly limited for complex/technical instructions.

> Claimant's ability to carry out routine, repetitive, 3-4 step, and detailed tasks with adequate persistence and pace would be intact, but markedly impaired for complex/technical tasks.

> Claimant's ability to handle co-worker and public contact would be somewhat reduced but adequate to handle brief and superficial contact.

> Claimant's ability to handle supervision would be restricted secondary to reduced stress tolerance but adequate to cope with reasonably supportive supervisory styles that could be expected to be found in many customary work settings.

> Claimant's ability to handle stress and pressure in the work place would be somewhat reduced. It would be adequate to tolerate the routine stresses of a routine repetitive, a 3 - 4 step, or a limited detail work setting, but not adequate for the stresses of a multi-detailed or complex work setting.

Tr. 659. Dr. Frederiksen stated this assessment was consistent with Schmid's activities of daily living and medical record and that while Dr. Wiger's medical source statement noted some limitations, it did not rule out work.

On July 19, 2007, Schmid had a follow-up visit with Dr. Saribalas.  Tr. 718. Schmid reported feeling better than during the previous consult.  Dr. Saribalas noted that the increased Seroquel had eliminated all of his mood fluctuation.  Id.  Schmid exhibited euthymic[5] mood and relatively reactive affect, he was pleasant and cooperative; he showed no suicidal or homicidal ideation, manic or hypomanic symptoms, flight of ideas, delusions or hallucinations; and his judgment and insight was fair to poor.  Id.  The plan for Schmid was to "[c]ontinue meds as is [sic] since he seems to be doing very well psychiatrically."  Id.

On December 14, 2007, Schmid saw Dr. Saribalas and reported that "his mood is very stable right now."  Tr. 717. Dr. Saribalas again indicated that Schmid exhibited euthymic mood, a reactive affect, he was pleasant and cooperative, showed no suicidal or homicidal ideation, exhibited no manic or hypomanic symptoms, no flight of ideas, no hallucinations and his judgment and insight were fair.  Id,

On December 19, 2007, Schmid began seeing David Kearn, M.A., L.P. for his bipolar disorder.  Tr. 748.  Kearn indicated that it took approximately 6 months before Schmid's bipolar disorder stabilized and Schmid had no further episodes since the January 2007 episode, although he had been depressed for three months.  Tr. 750. Kearn noted that Schmid currently appeared stable on his medications.  Id.  Kearn found Schmid to be neatly groomed, cooperative, calm and comfortable, alert and orientated x 3, exhibited normal speech, his thoughts were clear and relevant, he exhibited no evidence of hallucinations, reported sleep disturbances, and was not at

---

[5]   Euthymia:  "Moderation   of   mood,   not   manic   or   depressed." Http://www.medilexicon.com/medicaldictionary.php?t=30760.

risk for any harmful behaviors.  Tr. 749.  Kearn diagnosed Schmid with Bipolar I[6] Disorder and assigned him a GAF of 47.  Tr. 751.

On January 2, 2008, the Minnesota Department of Human Services determined Schmid was disabled for the period of January 1, 2008 through January 1, 2009 for the purpose of establishing eligibility for medical assistance.  Tr. 253.

On January 4, 2008, Kearn found Schmid to be orientated, with a normal affect, depressed mood and was not a risk for any harmful behavior.  Tr. 746.  On January 11, 18 and 21, 2008, Kearn found Schmid to be orientated, with a normal affect, and mood and was not a risk for any harmful behavior.  Tr. 745.  In addition, at the January 18, 2008 consult, the Kearn noted an improvement with Schmidt representing that he felt better.  Id.  At the January 31, 2008 consult, Kearn noted improvement.  Tr. 741.

On February 7, 2008, Schmid sought nutrition advice from a nutritionist regarding his gain of 70 pounds after taking Seroquel for his bipolar disorder.  Tr. 953.  On February 8, 15, 28 and March 14, 2008, Kearn found Schmid to be orientated, have a normal affect, an anxious mood and not a risk for any harmful behavior.  Tr. 736-40.  At the February 15 and March 14, 2008 consults, Kearn noted an improvement.  Tr. 737-38.  Id.  At the February 15 consult, Kearn indicated that Schmid's anxiety was tied to his frustration or dissatisfaction with his current life circumstances and slow rate of change in finding a job and moving ahead.  Tr. 738.  At the March 14, 2008 consult, Schmid indicated he had obtained information on job training and thought it was

---

[6]    A person with bipolar I has manic episodes, while someone with bipolar II, as opined by Dr. Wiger, has hypomanic episodes.  See Diagnostic and Statistical Manual of Mental Disorders, 392 (4th ed. 2000 Revision).

worthwhile.   Tr. 736.   Kearn also noted that Schmid was making progress with job related training.   Id.

On February 26, 2008, Schmid had a follow-up visit with Dr. Saribalas.   Tr. 716. Schmid reported being depressed but denied feeling helpless or hopeless.   Id. Dr. Saribalas indicated that Schmid exhibited a dysphoric mood and flat effect.   Id. Schmid's speech was at a decreased rate and tone, he had no delusions or hallucinations, his insight was fair to poor and he made good eye contact.   Id. Dr. Saribalas increased the dosage for Neurontin and started Schmid on Wellbutrin for the depression.   Id.

On June 2, 2008, Schmid saw Dr. Groschel saw regarding his migraines, neck pain and back pain.   Tr. 770.   Dr. Groschel noted that Schmid was taking Vistaril for anxiety.   Schmid appeared to be alert, attentive, cooperative and a good historian.   Id. Further, his mood and affect appeared to be stable.   Tr. 771.

During a July 21, 2008 consult, Kearn found Schmid to be orientated, have a normal affect, depressed mood (feeling mildly depressed) and was not a risk for any harmful behavior.   Tr. 1004.   In addition, Kearn noted improvement due to Schmid holding a job.   Id.

On July 25, 2008, Schmid had a follow-up visit with Dr. Saribalas.   Tr. 787. Schmid reported "things were going very well for him right now."   Id.   Schmid stated that he had short term inventory job, but that it was too overwhelming for him so he discontinued it.   Id.   Schmid was in no acute distress, alert and orientated, was pleasant and cooperative, showed no suicidal or homicidal ideation, exhibited no manic

or hypomanic symptoms, reported no hallucinations, and his judgment and insight were fair. Id. Dr. Saribalas opined that Schmid "seems to be doing very well right now." Id.

On July 28 and August 11, 2008, Kearn found Schmid to be orientated, have a normal affect, normal mood and was not a risk for any harmful behavior. Tr. 1002-1003. In addition, on both occasions Kearn noted an improvement in Schmid's mood. Id. Kearn also noted at the August 11, 2008 consult that Schmid showed less anxiety, Schmid was feeling less pressed or stressed and appeared to be coping well at the time. Tr. 1002.

On September 8, 2008, Schmid saw Dr. Dean Knudson, M.D.,[7] for anxiety. Tr. 994. Schmid indicated that his depressive symptoms had been of a moderate degree, with a mild to moderate loss of energy, a mild sense of decrease in the ability to sense pleasure and a mild to moderate level of insomnia. Tr. 994. As to the manic symptoms related to his bipolar disorder, Schmid denied "recent manic symptoms, and has not had manic symptom for one half years [sic], apparently related to treatment with Seroquel." Id. Schmid reported that he had some limited anxiety episodes, occurring every seven to fourteen days, which were characterized by mild chest pain, subjective anxiety, abdominal distress, sweating, mild tremor, occasional fear of death and shortness of breath. Id. Schmid denied any suicidal ideation or any elements of psychosis. Id. As to his past psychiatric history, Schmid stated that he was hospitalized once in January of 2007 for a severe manic episode and that he had been involved in individual psychotherapy for about one-and- half years. Id.

---

[7]     Kearn and Knudson are both associated with Nystrom and Associates.

Dr. Knudson found Schmid to be alert and oriented, with decreased range of affect as demonstrated by anxiousness and some sadness, increased intensity, moderately depressed subjective mood, normal speech, some digression in thought content and at times tangential, no overt symptoms of psychosis, intact ability to problem solve, and showed insight into his illness.  Tr. 998.

At Axis I, Dr. Knudson diagnosed Schmid with Bipolar Affective Disorder 296.53, and indicated he wanted to rule out Major Depression 296.33, mood disorder secondary to his HIV, and panic disorder without agoraphobia.  Id.  At Axis II, Dr. Knudson indicated he wanted to rule out Borderline, Histrionic, Dependent and Schizotypal traits.  Id.  On Axis III, Dr. Knudson listed Schmid's HIV, which was stable, recurrent migraines, cerebrovascular incidents, elevated triglycerides, elevated blood pressure, and an elevated blood glucose with no diagnosis of diabetes.  Tr. 999.  At Axis IV, Dr. Knudson noted a chronic mood disorder with a significant history of chemical dependency.  Id.  Dr. Knudson assigned Schmid a GAF of 60.  Id. Dr. Knudson indicated that Schmid was to continue taking his Neurontin and Vistiral as needed for his anxiety.  Id.  Dr. Knudson also increased Schmid's dosage for Seroquel, as he believed that Seroquel was effective for treating depression.  Id.

During a September 8, 2008 consult, Kearn found Schmid to be orientated, have a normal affect, normal mood and was not a risk for any harmful behavior.  Tr. 1001. In addition, Kearn noted an improvement in Schmid.  Id.  Schmid reported that he liked his new apartment and was hopeful about obtaining social security benefits.  Id. Schmid also discussed walking seven blocks to a grocery store.  Id.

On September 23, 2008, Schmid saw Dr. Knudson for a psychiatric follow-up. Tr. 993. Schmid reported being worried about his finances and that he dwelled on negative thoughts.  Id.  Schmid also reported feeling more stable.  Id.  Dr. Knudson indicated that Schmid had a normal appearance, gait, speech, his affect was nervous, his mood was sad, he showed normal thought process, memory, language and fund of knowledge, he had fair to good insight, was orientated x 3 and denied suicidal ideation. Id.

On the same day, Schmid saw Kearn who found him to be orientated, have a labile affect, was anxious and depressed and was not a risk for any harmful behavior. Tr. 992.  Kearn noted a deterioration in Schmid.  Id.  Schmid was worried about his finances, his mood was down due to worry, and he appeared to be confused.  Id.

On December 6, 2007, January 7, 2008, April 10, 2008 and November 24, 2008, Schmid saw Dr. Rhame for his HIV.  Tr. 790, 801, 825, 840.  Dr. Rhame noted that Schmid was not experiencing any side effects from his medication and that his HIV was under control with the last viral load being undetectable.  Tr. 790-91, 801-02, 825-26, 841-42.  He also noted that Schmid's adherence to his medication regimen was excellent.  Tr. 802, 825, 842.

During a December 18, 2008 consult, Kearn found Schmid to be orientated, with a flat affect, normal mood and not a risk for any harmful behavior.  Tr. 989.  In addition, Kearn noted an improvement in Schmid.  Id.  Schmid stated that he felt better and was less anxious when he is active.  Id.

On December 29, 2008, the Minnesota Department of Human Services determined Schmid was disabled for the period of January 1, 2009 through January 1, 2016 for the purposes of establishing eligibility for medical assistance.  Tr. 253.

On January 19, 2009, Schmid saw Dr. Knudson for a psychiatric follow-up. Tr. 988.  Dr. Knudson noted that Schmid was "overall better!"  Id.  Schmid had a normal appearance, gait and speech, his affect was slightly decreased, his mood showed some sadness, he showed a normal thought process, insight, memory, language and fund of knowledge, he was orientated x 3 and denied suicidal ideation. Id.

At consults on January 19 and February 2, 2009, Kearn found Schmid to be orientated with a flat affect, normal mood and not a risk for any harmful behavior. Tr. 986, 987.  Kearn noted on both occasions an improvement in Schmid.  Id.  In addition, at the January 19 appointment, Schmid reported doing better on the medication of Remeron, and at the February 2 appointment, Schmid reported that his medications were working better at that time.  Id.  At the February 2 appointment, Kearn also noted that Schmid was less stressed and was less worried due to taking Remeron.  Tr. 986.

On February 5, 2009, Schmid saw Dr. Rhame for a HIV follow up.  Tr. 962-64. Dr. Rhame found that Schmid's HIV was well controlled and that Schmid was demonstrating excellent adherence to his medication regimen and reported no side effects from the HIV medications.  Tr. 963-64.  Dr. Rhame also noted that Schmid had started on Remeron for his depression and Schmid believed that the medication was helping, though he reported sleeping a lot.  Tr. 964.

26

At a February 16, 2009 consult, Kearn found Schmid to be orientated, with a normal affect, and normal mood, and was not a risk for any harmful behavior.  Tr. 985. Kearn noted that Schmid appeared to be more stable and showed less anxiety.  Id.

On June 25, 2009, Kearn submitted a letter on behalf of Schmid, stating that he did not believe that Schmid was capable of sustaining competitive employment given his diagnosis of biplolar disorder.  Tr. 1013.  According to Kearn, Schmid had a history of mania with subsequent hospitalization, which was likely to reoccur at any time in the future, had a recent history of severe depression, and had an increased risk for relapse due to ongoing changes in his medication regimen.  Id.  Kearn opined that Schmid would be very likely to require additional days off of work.  Id.

As to Schmid's functional abilities, Kearn indicated he had an unlimited or very good ability to remember work-like procedures, understand and remember short instructions, carry out short instructions, make simple work-related decisions, adhere to basic tenants of cleanliness, ask simple questions or request assistance, and be aware normal hazards and take appropriate precautions; Schmid had a good ability to maintain attention for a two-hour segment, understand, remember and carry out detailed instructions, interact appropriately with the public, behave in an emotionally stable manner, and get along with co-workers and respond appropriately to changes in work routine; and he had a fair ability to set realistic goals, maintain regular attendance, sustain a routine without adequate supervision, work in coordination with others without being districted, complete a normal work week without interruptions from physiologically based symptoms, travel to an unfamiliar place, accept instructions and

respond appropriately to criticism from supervisors and deal with normal work stress. Tr. 1014-15.

Dr. Rhame also filled out a medical opinion form for Schmid's HIV.  Tr. 1020. Dr. Rhame stated that Schmid had AIDS, indicated Schmid had a treatment plan and that Schmid would not be able to perform any employment in the foreseeable future. Id.

### B.      Reports of Daily Activities

In a February 15, 2007 disability report, Schmid indicated he was applying for disability benefits due to HIV, bipolar disorder, migraines, hypertension and two strokes, which had impeded his balance and grasping.  Tr. 169-70.

On March 6, 2007, Schmid submitted a function report .  Tr. 191-198.  In this report, he indicated the following:  On a daily basis he got something to eat for breakfast, followed by a shower.  Tr. 191.  He then took the bus to appointments throughout the day.  Id.  He took his medication regimen throughout the day.  Id.  He ate lunch, went to more appointments, ate dinner, relaxed for the evening, made telephone calls and went to bed at about 10:00 to 10:30 p.m.  Id.  Schmid stated that his medication helped him get to sleep but that he had not been sleeping well for the past two months resulting in fatigue.  Tr. 192.  He also stated that his illnesses did not affect his ability to take care of himself except that because his back was weak, he had trouble putting on his socks.  Id.  Schmid did his own laundry every other day, and he did not do any yard work because it was too hard on his body.  Tr. 193-94.  Schmid went outside on a daily basis, walking or using public transportation, and he shopped in stores 2 to 3 times per week.  Tr. 194.  Schmid spent time with others watching television and going

28

out for entertainment, but most of the time he was on his own. Tr. 195. Schmid spoke with staff at his residence home daily for about 30 minutes to an hour. Id. Schmid visited doctors, social workers and counselors on a regular basis and he did not have any problems getting along with family, friends, neighbors or others. Tr. 195-96. Schmid indicated that his back and neck caused him pain and headaches, and the numbness his hand made it hard for him to complete certain tasks. Tr. 196. Schmid also indicated he could walk for four blocks before taking a 10-minute break, could pay attention for a period of 5 minutes, could not follow written instructions very well, and could follow written instructions if the instructions were not complicated. Id. Schmid stated that he got along well with authority figures, he had been let go from a job in the past because he became impatient with "dictatorship," and was more focused on being an entrepreneur. Tr. 197. Schmid provided that stress increased his anxiety and blood pressure. Id. In addition, Schmid stated that changes in routine made him confused and anxious. Id. Schmid noted no unusual behaviors or fears. Id.

Schmid's grandmother, Lyla Nystrom completed a "Function Report-Adult-Third Party" for the SSA on March 8, 2007. Tr. 199-206. Nystrom noted that Schmid was bipolar; he could not prepare meals due to numbness in his right hand; he had no difficulty taking care of himself, except for bending and putting on his socks; he was able to do basic cleaning and laundry for about two hours a day; he was unable to do house or yard work; he was able to go outside and to places on a daily basis by himself; he shopped at stores twice a week for periods 4 to 6 hours; he was able to pay bills and count change; he watched television and played bingo; and he spent time with others. Tr. 200-04. Nystrom also stated that Schmid did not require reminders to take care of

his personal needs and grooming, but did need to have his medical regimen written down. Tr. 201. Schmid was unable to finish what he started and was able to follow written and spoken instructions. Tr. 204. Nystrom believed that Schmid could pay attention for about a half hour. Id. Schmid's disability, in form of his neck and back pain, along with nerve damage, caused him back problems and hand numbness. Id. Schmid could walk for a few blocks before needing a ten-minute break. Tr. 204. Schmid was able to get along with authority figures. Tr. 205. Nystrom also noted that stress gave Schmid high blood pressure, he was able to handle changes in his routine and she noted no unusual behaviors or fears in Schmid. Tr. 205.

Schmid submitted a subsequent disability report on May 17, 2007, in which he represented that his illnesses or conditions had not worsened since his previous February 15, 2007 report. Tr. 215. Schmid noted that he had received a diagnosis for bipolar disorder and his bipolar medication was hindering his ability to concentrate as needed for him to work. Tr. 215, 222.

On May 25, 2007, Schmid's nurse, Stephanie Richard, who had known Schmid for four months, completed a "Function Report-Adult-Third Party" for the SSA. Tr. 233-240. Richard noted that Schmid made his own breakfast, washed his clothing and was able to attend his appointments. Tr. 233. Richard indicated that Schmid's condition did not affect his ability to sleep or his ability to take care of himself, he needed no reminders to take care of himself or his take medication, he was able to go out on a daily basis, frequently went shopping in stores, and was able to handle money. Tr. 234-36. Schmid's hobbies included watching television, reading and conducting recreation activities with others three times a week and attending church twice a month. Tr. 237.

30

In Richard's opinion, Schmid's condition limited his ability to lift, walk, sit, climb stairs, concentrate, understand and use his hands.  Tr. 238.  Richard noted that Schmid was able to concentrate for 5-10 minutes, and to follow spoken instructions, had good interpersonal skills, worked at a slow pace, would become very agitated and anxious with stress and had no unusual behaviors or fears.  Tr. 238-39.

On December 16, 2008, Schmid filled out a psychological disability questionnaire.  Tr. 1032-1040.  Schmid indicated that he had been diagnosed with bipolar disorder I, HIV and chronic mood disorder, with a GAF of 60.  Tr. 1032.  Schmid stated he was taking Seroquel and Neurontin so he would not become manic.  Id.  Schmid also provided that taking so many medications hindered his ability to concentrate all day.  Tr. 1034.  Schmid noted that his daily activities consisted of getting up, taking his medicine, eating lunch, going grocery shopping or to see the doctor, cleaning his apartment, and going to sleep.  Tr. 1035.  Schmid stated that he needed no reminders to take care of his personal needs or to take his medicine.  Tr. 1036.  He could prepare meals, and do light clean up duties like laundry, wash dishes, dust and some other cleaning, however outside yard work was too difficult for him because he ran out of breath.  Tr. 1037.  Schmid went out on a daily basis and travelled alone using public transportation.  Tr. 1037-38.  Schmid shopped in stores three times a week for at least one hour.  Tr. 1038.  Schmid paid bills and counted change.  Id.  His hobbies included watching the television and reading books from the library.  Id.  Schmid indicated that he had no problems dealing with others.  Tr. 1039.  He visited with people in person on a daily basis for about an hour.  Id.  According to Schmid, his psychological impairment affected his ability to complete tasks and to concentrate.  Tr. 1040.  Schmid

had a hard time finishing what he started, his ability to follow written instructions was pretty good, he had a superb memory and his stress caused him migraine headaches. Id.

### C.   Hearing Before the Administrative Law Judge

Schmid appeared at a hearing before the ALJ on June 2, 2009.  Tr. 42.  Schmid went to school through twelfth grade but never graduated.  Tr. 44.  While Schmid did not have a driver's license, he was unsure he could obtain one due to his medication regimen.  Tr. 45.  Schmid was receiving food stamps, medical assistance and general assistance.   Tr. 46.   Schmid noted that his HIV was getting better due to the medications he was taking.  Id.  In addition, Schmid stated that he was experiencing no side effects from his medications.   Tr. 56.   Schmid testified that he could not work because he had a lot of medical appointments to keep.  Tr. 47.  Schmid also testified that his most disabling condition was his bipolar disorder.  Tr. 56.  Schmid stated that some days he felt happy and other days he felt sad, which affected what he could accomplish.  Tr. 56-57.  Schmid acknowledged telling his providers that he was looking for a part time job and some opportunities for volunteer work.  Tr. 59.

The ALJ asked the VE questions regarding a hypothetical person of Schmid's age:

> Q  All right. Mr. Maspon -- David Kern [sic] here at 43 [INAUDIBLE] assessment and he's indicating understand and remember short, simply instructions carry them out all unlimited very good, do a routine and work in proximity to others is fair, in this form fair is defined as seriously limited but not precluded, good as defined as limited but satisfactory, unlimited, very good is more than satisfactory, and [INAUDIBLE] no useful ability to function. So then you got emotional stability is good, deal with the public good, [INAUDIBLE] cleanliness is unlimited to very good, ask

simple questions, request assistance unlimited to very good. Got a couple of fears traveling in unfamiliar place and accept instructions. Good on deal with coworkers, respond appropriately, very good on be aware of hazards and fair on deal with stress, says [INAUDIBLE] with bipolar disorder mood anxiety irritability and can vary significantly from day to day, has difficult time -- something logical -- taking logical steps to address problems that might occur on the job although typical for many situations he can become anxious quickly, miss more than three times a month, can manage funds in his own best interest -- signed David Kern. Mr. -- he's a psychologist apparently, 6/25 of '09 from [INAUDIBLE] past work any other jobs in the regional or national economy with that profile?

A Well your honor once again the courier and lot attendant would not be precluded, for sure lot attendant would meet that.

Q What about that absenteeism level -- missing more than three times a month any thoughts about that?

A Well that would -- over time, preclude sustaining employment that would just not be tolerated any more.

Q All right so he's going to miss more than three times a month he's not going to be employable?

A I don't believe that that particular condition would be conducive to sustained employment your honor.

Q DDS has got him at low stress routine work, away from superficial contact with public, coworkers, and supervisors, and I would think based on his testimony light [INAUDIBLE] would be fine. You're saying that the past work would be doable with that profile?

A With respect to lot attendant and courier yes, lot attendant and courier yes, lot attendant more so but both would not be precluded.

Tr. 52-54.

## V.    DISCUSSION

Schmid's challenge to the Commissioner's decision all centered on the RFC assigned by the ALJ.   First, Schmid contested the ALJ's reliance on his alleged improvement or "doing well."   See Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Pl.'s Mem."), p. 16, 19-23.   Second, Schmid argued that the ALJ failed to fully and fairly develop the record by not giving sufficient weight to the opinions of his treating mental health providers Kearn and Dr. Saribalas, and instead accorded greater weight to opinions of other medical providers and state agency doctors, including non-examining state agency providers and providers who did not specialize in psychology.  Id., pp. 16-17, 24-27, 30-31.  Schmid also contended the ALJ should have re-contacted providers who provided inconsistent information, including Kearn and Dr. Wiger, and he should have addressed the disability determinations of the Minnesota Department of Human Services.  Id., pp. 28-30.  Finally, Schmid challenged the VE's opinions on his ability to perform past relevant work on the basis that the hypothetical posed to the VE was based on a faulty RFC.  Id., pp. 31-34.

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1).   The ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments.  See Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  Id. at 1218 (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)); see also Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) ("the burden of persuasion to prove disability and demonstrate RFC remains on the claimant.").  On the other hand, the

determination "that a claimant is 'disabled' or 'unable to work' concern issues reserved to the Commissioner.  See Vossen, 612 F.3d at 1015.

In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations.  See Pearsall, 274 F.3d at 1217.

The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence."   Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000).  Nonetheless, the RFC determination must be supported by "medical evidence that addresses claimant's 'ability to function in the workplace.'"   Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003) (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)).

Before making the final RFC determination, the ALJ must evaluate the credibility of the claimant's subjective complaints by considering the objective medical evidence and any evidence relating to the claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions.  See Pearsall, 274 F.3d at 1218 (citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)).

"An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole." Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993.))   For example, the ALJ may find a claimant's subjective complaints "inconsistent with daily activities, lack of treatment, demeanor, and objective medical evidence." Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); see also Cox, 160 F.3d at 1207.  If the ALJ

rejects a claimant's complaint of pain, "the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony."   Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).  "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in Polaski when making credibility determinations."   Id. Nevertheless, the failure to address each of the Polaski factors separately does not render the ALJ's determination invalid.   See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (finding that although the ALJ had not explicitly articulated his credibility determination, she did so implicitly by evaluating the claimant's testimony under the Polaski factors and by identifying inconsistencies between the claimant's statements and evidence in the record); see also Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (holding that ALJ was not required to methodically discuss each Polaski consideration, so long as he acknowledged and examined those considerations).

With these general principles in mind, the Court now analyzes the four errors assigned by Schmid.

## A.    ALJ's Reliance on Schmid's Alleged Improvement or "Doing Well"

Schmid asserted that the ALJ's reliance on his improvement as to his HIV and bipolar disorder was in error because improvement does not equal an ability to work. See Pl.'s Mem., pp. 19-20.  In support, Schmid argued that the ALJ made no mention of the side effects of the medications he was taking, including his 70 pound weight gain and the potential for diabetes, and any finding that he was "doing well" must be considered in the context that he has HIV, a potentially fatal condition, and bipolar disorder, a chronic disorder characterized by extreme and sometimes abrupt changes in

mood.  Id., pp. 20-21.  Schmid also asserted that while the ALJ took into account his various daily activities of living, these activities are not sufficient to show that he has the functional capacity to engage in substantial activity, especially when he has stated that he has difficulty concentrating for 10 minutes at a time.  Id., pp. 22-23.

The Court finds that ALJ did not error by failing to mention the side effects of the medications Schmid was taking to control his HIV and bipolar disorder, including the 70 pound weight gain he attributes to Seroquel and the potential for contracting diabetes. Schmid acknowledged at the hearing that he did not have any side effects from the medications he was taking.  Tr. 56.  Schmid's providers noted no continued or lasting side effects from his HIV or bipolar medications, except that the weight gain occurred after the commencement of the Seroquel.  Tr. 790-91, 801-02, 825-26, 841-42. 866-67, 953, 963-64.  Not only is there no evidence in the record to support Schmid's belief that the weight gain was caused by Seroquel, but Schmid does not assert, nor has he provided any evidence that this weight gain or the possibility of developing diabetes in the future affects his present RFC.

The Court also finds that the ALJ did not error by failing to take into account the potential severity that HIV and bipolar disorder may impose on Schmid.  By Schmid's reasoning, a diagnosis of HIC positive and bipolar disorder would automatically qualify him for benefits.  However, it is not the claimant's condition or the potential for impairment or death that is paramount, but the impairments a claimant actually experiences from these conditions that factor into his RFC and by extension his eligibility for benefits.  See generally, Bradley v. Astrue, 528 F.3d 1113, 1115-16 (8th Cir. 2008) (finding that although the claimant suffered from "HIV and no doubt faces

significant obstacles in both his work and personal life," the Eighth Circuit ultimately concluded that the claimant did not suffer from an impairment under the SSA regulations and that the ALJ's decision to deny disability benefits was supported by substantial evidence in the record).

Finally, it is true that engaging in daily activities does not necessarily constitute substantial evidence that Schmid has the functional capacity to engage in substantial gainful activity.  See Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) ("This court has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity.") (quoting Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000)).   However, although claimant need not establish that he is bedridden to be disabled, his credibility regarding subjective complaints of pain or other mental impairments can be undermined by daily activities under a Polaski analysis.  See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001) (finding inconsistencies between subjective complaints of pain and daily living patterns where claimant could care for personal needs, wash dishes, change sheets, vacuum, wash cars, shop, cook, pay bills, drive, attend church, watch television, listen to the radio, visit friends and relatives, read and work on the construction of his home); Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir.1999) (finding that claimant's ability to cook some meals, water the flowers around his house, help his wife paint, watch television, go out for dinner, occasionally drive an automobile, and occasionally visit with friends, did not support a finding of total disability); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (concluding that the credibility of claimant's allegations of disabling

38

pain was undermined by his daily activities, including caring for children, driving, and occasional grocery shopping).

Here, while he did not specifically discuss Schmid's daily activities in the determination of the RFC at Step Four, the ALJ did address his activities at Step Two of the analysis in determining whether Schmid has an impairment or combination of impairments that meets or medically equals one of the listed impairments under 20 CFR Part 404, Subpart P, Appendix 1.   Tr. 21.   In particular, after summarizing Schmid's daily activities, the ALJ concluded that Schmid was mildly restricted in activities of daily living and had moderate difficulty in social functioning.   Id.   This conclusion is borne out by both Schmid's self-reports of his daily activities and the observations of others noted in the records,   Tr. 191-206, 233-240, 540, 564, 1035-1039.   In particular, as of December 2008, Schmid indicated that his daily activities included going out daily, using public transportation, grocery shopping three times a week, going to the doctor, cooking, doing laundry, washing dishes, dusting; his hobbies included watching the television and reading books from the library; and he visited with people in person on a daily basis for about an hour.   Tr. 1035-1039.   Although it would have been preferable for the ALJ to address Schmid's daily activities in his determination of the RFC, his failure to do so does not lead the Court to conclude that Schmid's daily activities support a finding of disability.

In sum, the Court finds that the ALJ's reliance on the various medical providers' observations that Schmid was doing well and showing improvement with treatment for both his HIV and bipolar disorder was accurate and supported by substantial evidence

in the record.  The record indicated that from the onset of the HIV and bipolar disorder,

Schmid's conditions and ability to function did improve.

> **B.**   **ALJ's Duty to Fully and Fairly Develop the Record**

Schmid argued that the ALJ should have afforded substantial weight to the

opinions of Kearn and Dr. Saribalas, given they were his treating providers and

specialists, instead of giving greater weight to state agency medical sources and non-

psychiatric medical doctors.  Id., pp. 24-27.  Further, to the extent that there was a

conflict between Kearn's opinions and his notes, the ALJ should have re-contacted

Kearn for a clarification.  Finally, Schmid asserted that the ALJ erred because he failed

to consider the determinations of the Minnesota Department of Human Services that he

was disabled.  Id., pp. 28-29.

In opposition, the Commissioner argued that any opinion by Kearn that Schmid

was disabled should be rejected as disability is a finding reserved for the ALJ.  See

Defendant's Memorandum in Support of Summary Judgment ("Def.'s Mem."), p. 13.

The Commissioner also contended that the ALJ reasonably found that Kearn's disability

opinion was not entitled to much weight because it was inconsistent with the record as a

whole, just as Kearn's statement that Schmid could relapse at any moment was

inconsistent with the medical records which reflected only one manic episode in January

2007 that required hospitalization, and since then overall improvement in his condition.

Id. p. 14.  The Commissioner also asserted that Kearn's opinions were contrary to the

findings of Dr. Rhame, Dr. Saribalas, Dr. Wiger and even Kearn's own treatment notes.

Id.  The Commissioner observed that the ALJ adopted Dr. Wiger's opinion for the most

part, and that to the extent the ALJ rejected Dr. Wiger's opinion about stressors in the

workplace, he reasonably relied on the evaluation of the record performed by Dr. Frederickson, the state agency psychologist, including her analysis of Dr. Wiger's report. Id., pp. 15-16. The Commissioner maintained that because the ALJ's findings were consistent with the record, there was no obligation to re-contact medical sources and any burden to present evidence was on Schmid and his attorney. Id., pp. 16-17. Finally, the Commissioner asserted that contrary to Schmid's contention, the ALJ did consider the disability findings of the Minnesota Department of Human Services and that such findings are not binding on determinations made by the SSA.

In reply, Schmid took issue with the Commissioner's assertion that a psychologist's opinion that a patient has deficiencies in stability, stress and schedule are issues reserved for the Commissioner. See Plaintiff's Reply Memorandum, p. 3. In Schmid's view, the ALJ "cherry-picked" the evidence, and ignored the notes regarding Schmid's anxiety, depression and increase in medication dosage. Id., pp. 4-5. Schmid reiterated his assertion that Kearn and Dr. Wiger should have been re-contacted in order to clarify any inconsistences the ALJ found with their opinions and the overall record. Id., pp. 5-6.

The weight to be afforded to the opinions of a treating physician is described by the Eighth Circuit as follows:

> "A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. See 20 C.F.R. § 404.1527(d)(2). Whether the ALJ gives great or small weight to the opinions of treating physicians,

the ALJ must give good reasons for giving the opinions that weight. Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). Moreover, a treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement. Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996). See also Thomas v. Sullivan, 928 F.3d 255, 259 (8th Cir. 1991) (holding that the weight given to a treating physician's opinion is limited if the opinion consists only of conclusory statements).

Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008).

In this case, the ALJ indicated that he gave "little weight" to the opinion of Kearn, Schmid's treating psychologist, that Schmid was unable to sustain competitive employment. Tr. 25. On June 25, 2009, Kearn submitted a letter on behalf of Schmid stating that he did not believe that Schmid was capable of sustaining competitive employment, given his diagnosis of bipolar disorder. Tr. 1013. In support, Kearn stated that Schmid had a history of mania with subsequent hospitalization, which was likely to reoccur at any time in the future. Id. Kearn also noted Schmid had a recent history of severe depression. Id. Kearn opined that Schmid had an increased risk for relapse due to ongoing changes in his medication regimen. Id. Further, Kearn stated that Schmid would very likely require additional days out of work. Id. The ALJ found that Kearn's opinions contrasted with the overall medical record and the notes from his own clinic, Nystrom and Associates, including an opinion by psychiatrist Dr. Knudson that Schmid had a GAF of 60. Tr. 24-25. Instead, the ALJ afforded greater weight to records from Dr. Rhame, Schmid's infectious disease and internal medicine doctor,

showing an improvement in Schmid's mental and physical condition, which was supported by the opinions of Dr. Frederiksen, state agency psychologist.  Tr. 25.

Kearn's statement that Schmid could not perform any competitive employment invades the issue ultimately reserved for the Commissioner and is entitled to no deference.  See 20 C.F.R. § 404.1503(b); Vossen, 612 F.3d at 1016 (8th Cir. 2010) (issue of disability reserved to Commissioner); House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2008) ("[a] treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination.") (citing Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)); Cox, 495 F.3d at 619 (issue of RFC reserved to Commissioner).

More importantly, Kearn's own treatment records do not support his opinion that Schmid was unable of sustaining competitive employment due to likely absences resulting from his bipolar disorder.[8]  Tr. 1013.  Indeed, in his first report regarding Schmid in December 2007, Kearn stated that Schmid had experienced no further bipolar episodes since the January 2007 episode and indicated that Schmid was stable on his medications, cooperative, alert and orientated x 3, exhibited normal speech, his thoughts were clear and relevant, there was no evidence of hallucinations, he appeared to be calm and comfortable and was not a risk for any harmful behaviors.  Tr. 749. During his subsequent consultations with Schmid, while Kearn noted anxiety from time-

---

[8]     While Schmid faulted the ALJ for not considering the effects of his depression and anxiety as to his RFC, Schmid never raised this issue before the Commissioner and therefore, any such argument is waived as it relates to judicial review.  See Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

to-time, depressed moods and frustration, there was no mention of any manic or hypomanic episodes.  Indeed, as the ALJ observed, for the most part, Kearn's notes indicated that Schmid was generally improving, his mood and affect were normal, and he was more stable and exhibited less anxiety.  Tr. 736-38, 740-46, 985-87, 989, 992, 1001-04.

As stated previously, "[t]he ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions."  Hogan, 239 F.3d at 961 (citation omitted) (emphasis added).  Given the inconsistency between Kearn's opinion that Schmid could not sustain gainful employment and his treatment notes, the ALJ did not error in discounting the weight of the opinion afforded by Kearn.  Further, an inconsistency between the opinion and records of a provider does not require contacting the provider to explain the inconsistencies.  "[T]he requirement for additional information is triggered only when the evidence from the treating medical source is inadequate to make a determination as to the claimant's disability."  Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002) (citing 20 C.F.R. § 416.912(e)(1)); see also Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005) (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)) ("While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'").  Here, Kearn's records are neither inadequate nor undeveloped.  Rather, they do not support Kearn's ultimate opinion that Schmid cannot work.

In addition, Schmid's claim that he cannot work based on the bipolar disorder is not supported by the findings of his treating mental health providers Dr. Saribalas and Dr. Knudson.  Schmid treated with Dr. Saribalas from April 11, 2007 through July 2008. As of April 11, 2007, Dr. Saribalas noted that Schmid was feeling better and continued him on his medication, as he seemed stable.  Tr. 954-56.  On June 21, 2007, Schmid reported being depressed, but did not show any manic or hypomanic symptoms. Tr. 719.  By July 19, 2007, Schmid reported to Dr. Saribalas feeling better, and that the increased Seroquel had eliminated all of his mood fluctuation.  Id.  Dr. Saribalas stated that Schmid was to "[c]ontinue meds as is [sic] since he seems to be doing very well psychiatrically."  Id.  Schmid again reported being depressed on February 26, 2008, but showed no manic or hypomanic symptoms.  Tr. 716.  On July 25, 2008, Schmid reported to Dr. Saribalas that "things were going very well for him right now."  Tr. 787.

On September 8, 2008, Schmid saw Dr. Knudson for anxiety and depression. Tr. 994.  Dr. Knudson noted that Schmid's symptoms of depression were mild to moderate.  Tr. 994.  Schmid denied any manic symptoms associated with his bipolar disorder and stated he had not had any manic symptoms for a year-and-a-half.  Id.  As for anxiety, Schmid told to Dr. Knudson that he had some limited anxiety episodes, occurring every seven to fourteen days.  Id.  Based on his examination of Schmid, Dr. Knudson assigned Schmid with a GAF of 60, recommended continuation of his current medication as needed for his anxiety, and increased the dosage for Seroquel, as he believed that Seroquel was effective for addressing the depression.  Id. Dr. Knudson's other entries for Schmid made no mention of any bipolar episode, and only mentioned his sad mood and anxiety as a deficit during otherwise normal mental

status examinations.   Tr. 988, 990, 993.   On January 19, 2009, the last time Dr. Knudson saw Schmid, Dr. Knudson noted that Schmid was "overall better!" Tr. 988.[9]

In short, the information provided by Dr. Saribalas and Dr. Knudson do not support Schmid's claim that he cannot work due to his bipolar disorder.

Moreover, Schmid's claim that he cannot work based on the bipolar disorder is not supported the medical record from Schmid's other treating providers.   From January 23, 2007 through January 26, 2007, Schmid was admitted to the emergency room and diagnosed with a single hypomanic episode.  Tr. 283-89.  By February 1, 2007, staff at Riverwind Crisis Services reported that Schmid appeared to be at "baseline" and that he appeared to be "a lot less manic and is sleeping more most likely due to the administration of his Seroquel."   Tr. 303-04.   Thereafter, the records at Riverwind Crisis Services indicated that Schmid had stabilized, appeared upbeat and his manic behaviors had decreased.  Tr. 305-07.  On February 2, 2007, Dr. Ricart and Dr. Lubka both noted that Schmid was taking Seroquel and that he was feeling much better.  Tr. 310, 312.  On February 16, 2007, Schmid presented to therapist Dr. Wilson due to his recent "nervous breakdown."  Tr. 382.  Dr. Wilson noted that Schmid was well-groomed, cooperative, in a comfortable mood, showed an appropriate affect, normal speech, intact thought, no problems with perception, calmer motor functions, was orientated x 3 cognitively, had average intelligence, and had age appropriate insight.  Id.  Dr. Wilson assigned Schmid with a GAF score of 45.  Id.  From

---

[9]     This was one month before Kearn's last consultation with Schmid on February 16, 2009, where Kearn found Schmid to be orientated, with a normal affect and mood, more stable and showing less anxiety.  Tr. 985.

February 21, 2007 through May 23, 2007, Wilson saw Schmid and by April 18, 2007, reported that Schmid appeared to be proactive and sounded better, "looked good + sounds great" and "was antsy to get on with his life." Tr. 539-40.

As of April 18, 2008, Dr. Rhame stated that Schmid's mood was good, that Schmid was interested in joining the local YMCA and a mental health support group and that Schmid noted that he needed to get out more and that he was seeking a part time job. Tr. 801. In April and November 2008, Dr. Rhame noted that Schmid's bipolar condition was "well-controlled", in contrast to the January 2008 visit where Dr. Rhame noted that the bipolar condition was of an uncertain status (noting that Schmid was seeing the psychologist for the disorder). Tr. 791, 826, 1012. On February 5, 2009, Dr. Rhame noted that Schmid had started on Remeron for his depression and Schmid believed that the medication was helping, although he reported sleeping a lot. Tr. 964. There was no mention of any problems regarding Schmid's bipolar disorder or taking any new medications for the condition.

In summary, none of Schmid's treating providers, including Kearn, made any mention of Schmid suffering another manic or hypomanic bipolar episode after the January 2007 episode, and all of them indicated that the bipolar disorder was under control, thereby contradicting Kearn's opinion that Schmid was disabled due to his bipolar condition or that he would need multiple days off a month because of the condition. Although a treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and not inconsistent with other substantial evidence in the record, an ALJ need not accept the opinion if it does not meet those criteria. Clevenger v. Social Sec. Admin.,

567 F.3d 971, 974 (8th Cir. 2009). Here, substantial evidence in the record as a whole supports the ALJ's conclusion that Kearn's opinion is inconsistent with the record and therefore, the ALJ did not error by failing to accept the opinion or providing it with substantial weight.

As for Schmid's July 3, 2007 psychological consultation with Dr. Wiger, the Court finds that the ALJ properly discounted his opinion that Schmid's bipolar disorder would render him unable to deal with workplace stressors. Dr. Wiger opined that Schmid's symptoms were consistent Bipolar II disorder. Tr. 565. At the same time, Dr. Wiger opined that Schmid had no thought disorder and exhibited no concerns regarding the quality of speech and thought, obsessions, compulsions, suicidality, hallucinations, illusions or delusions. Id. Dr. Wiger further found Schmid was in touch with reality and was properly orientated, his attention was within normal limits, he showed adequate memory, was in touch with current events, had abstractive capacity and judgment, and presented no evidence of a somatoform or personality disorder. Id. At the end of the interview, Schmid reported to Dr. Wiger that he felt better and he would like to go to work, but that he was trying to work on his health. Id. Dr. Wiger assigned Schmid with a GAF of 49. Tr. 566. With respect to his functional abilities, Dr. Wiger opined that Schmid was able to understand directions, could carry out mental tasks with reasonable persistence and pace, handle money and respond well to other people, but that he would have many difficulties handling the stressors of the workplace. Id. The ALJ agreed with and accepted Dr. Wiger's assessment of Schmid's functional abilities, but rejected Dr. Wiger's opinion that Schmid would have many difficulties handling the

stressors of the workplace because it was inconsistent with the medical record.  Tr. 24-25.

As a preliminary matter, the Court notes (as did Dr. Frederiksen, the state agency consultant), that Dr. Wiger did not opine that any difficulty Schmid might have handling the stressors of the workplace precluded him from working.  In any event, the Court agrees with the ALJ that Dr. Wiger's suggestion that Schmid would have many difficulties handling the stressors of the workplace is not supported by the balance of his report which reflected a normal examination and functional abilities.  Further, the record showed that other than in January 2007, Schmid exhibited no manic or hypomanic symptoms prior to after the date of Dr. Wiger's opinion.

For the same reasons, the Court also rejects Schmid's suggestion that the ALJ erred in relying on the opinions of Dr. Frederiksen, the state agency consultant.  On July 19, 2007, Dr. Frederiksen performed a review of Schmid's medical records and determined that he had been recently diagnosed bipolar disorder and that he had a good response to medications.  Tr. 646.  Based on his improvement and stabilization with the use of medication, no documented mood swings since his hospitalization in January 2007, intact cognition and daily activities, Dr. Frederiksen rejected Dr. Wiger's opinion that Schmid would have difficulty managing workplace stressors, and concluded that he had mild limitations to activities of daily living; mild to moderate limitations to social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation.  Tr. 653, 655.  Again, the opinions by Dr. Frederiksen as to Schmid's bipolar disorder and the limitations caused by it are supported by the substantial evidence in the medical record.  Through the ALJ's

decision, Schmid had had no other bipolar episodes after being placed on the Seroquel, his mental health continued to improve and his daily activities remained substantially the same.   Based on the record as a whole, the ALJ properly relied on the opinions of Dr. Frederiksen.   See Ingram v. Astrue, No.4:09CV1358 TIA, 2011 WL 1226957, at *12 (E.D. Mo. March 29, 2011) ("the ALJ properly relied upon the consulting physician's assessment which was based on superior medical evidence.").[10]

Finally, Schmid's assertion that the ALJ should have considered the disability findings by Minnesota Department of Human Services, finds no support in the record or the law.   The ALJ specifically acknowledged that Schmid had been found disabled by this state agency for medical and general assistance, but that these determinations had little bearing on the determination of Schmid's RFC as it related to social security disability benefits.   Tr. 25.   The ALJ was correct.

Social Security regulations provide in relevant part that:

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us.

---

[10]   This Court notes that state agency physicians also determined that Schmid's HIV was not a disabling impairment.  Tr. 496-98.   As of January 16, 2007, the HIV count in Schmid was undetectable and Schmid's immune cell levels had recovered.  Tr. 317. Similarly, Dr. Rhame noted on several occasions that Schmid's HIV was under control. Tr. 560, 791, 802, 826.

20 C.F.R § 404.1504.  In addition, Social Security Ruling ("SSR") 06-3p sets forth how

the SSA considers decisions made by other governmental agencies on the issue of

disability:

> when we make a determination or decision of disability, we
> will consider all of the available evidence in the individual's
> case record. This includes but is not limited to objective
> medical evidence . . . information from other nonmedical
> sources and decisions by other governmental . . . agencies.
>
> * * *
>
> Our regulations . . . make clear that the final responsibility for
> deciding certain issues, such as whether you are disabled, is
> reserved to the Commissioner. . . .   However, we are
> required to evaluate all of the evidence in the record that
> may have a bearing on our determination or decision of
> disability, including decisions by other governmental and
> nongovernmental agencies.

SSR 06-3p, 71 F.R. 45593-03, 2006 WL 2263437 at *44594, 45596 (Aug. 9, 2006).

The ruling explicitly provides that "evidence of a disability decision by another

governmental or nongovernmental agency cannot be ignored and must be considered."

Id. at *45596.

Here, the ALJ considered the state agency determinations and correctly

concluded that they did not dictate his determination.  The Court finds no error on the

part of the ALJ in this regard.

For all of the reasons stated above, the Court concludes that substantial

evidence in the record as a whole supported the RFC reached by the ALJ and his

decision to assign little weight to Kearn's opinion on Schmid's inability to sustain

competitive employment and to Dr. Wiger's opinion regarding Schmid's ability to handle

workplace stressors, and to confer greater weight to the opinions of other providers.

The medical evidence from treating and non-treating providers supports the ALJ's determination that Schmid suffered an episode of bipolar disorder in January 2007 requiring his hospitalization. However, after this episode, there was an absence of any further manic or hypomanic episodes, Schmid responded well to medications to control his HIV and bipolar disorder, and exhibited improvement and stability in his conditions and activities.

At the end of the day, it is the "province of the ALJ, not the Court, to weigh and resolve conflicting evidence provided by medical professionals." Lundgren v. Astrue, Civ. No. 09-3395 (RHK/LIB), 2011 WL 882084 at *12 (D. Minn., Feb. 7, 2011) (Report and Recommendation adopted by Lundgren v. Astrue, 2011 WL 883094 at *1 (D. Minn., March 11, 2011) (citing Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995) ("It is the ALJ's function to resolve conflicts among the various treating and examining physicians.")).

This Court finds no error in the way in which the ALJ considered and weighed the medical evidence and the opinions of physicians who treated and examined Schmid, along with those who did not. The ALJ's decision was reasonable and based on the substantial record as a whole and it should not be disturbed.[11]

## C.   VE Hypothetical

Schmid argued that because the ALJ improperly determined Schmid's RFC, the testimony of the VE relied upon by the ALJ in determining whether Schmid could

---

[11]     Schmid intimated that the ALJ failed to set forth a physical RFC. See Pl's Mem., p. 27 n. 20. However, the ALJ specifically found Schmid had the capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). Tr. 22.

perform his past work cannot constitute substantial evidence to support a denial of benefits.

In response to the first hypothetical to the VE, in which the ALJ described a claimant with bipolar disorder, mood, anxiety, and irritability, and absenteeism of missing more than three days a month, the VE opined that the claimant could not sustain employment.  Tr. 52-53.  In response to the second hypothetical, which provided for a low stress environment with superficial contact with co-workers and supervisors, the VE found that Schmid could perform past relevant work as a lot attendant and courier.  Tr. 53-54.  Schmid contended that the ALJ improperly adopted the second hypothetical, (Tr. 32), and did not explain why he rejected the first hypothetical and specifically, the issue of absenteeism.  See Pl.'s Mem., pp. 33-34.

The Commissioner countered that because the hypothetical question adequately set forth the RFC to the VE, the subsequent testimony by the VE was based on the substantial evidence in the record.  See Def.'s Mem., p. 20.

A hypothetical question posed to a vocational expert must relate with precision all of the claimant's impairments.  Rappoport v. Sullivan, 942 F.2d 1320, 1323 (8th Cir. 1991). If the ALJ's decision is supported by substantial evidence, the hypothetical question need only contain those limitations accepted by the ALJ as true.  Id. Testimony from a vocational expert, which was based on a properly phrased hypothetical question, constitutes substantial evidence supporting the ALJ's decision. Id. On the other hand, "[t]estimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support

the ALJ's decision." Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006) (quoting Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994)).

As stated previously, the mental RFC assigned by the ALJ was that of a job involving repetitive tasks, in a low stress environment, with only brief and superficial contact with others in a job. The Court has already discussed that it was appropriate for the ALJ to discount the opinion of Kearn that he would be required to miss multiple days due to his bipolar condition based on the substantial evidence in the medical record. See, supra, section V.B. Further, as discussed above, the ALJ properly weighed the medical opinions and evaluated Schmid's subjective complaints in arriving at the RFC. The ALJ then posed a hypothetical question to the VE that included all of his limitations from mental and physical impairments, which this Court has found to be supported by substantial evidence in the record. Thus, the ALJ did not err in relying on the VE's testimony in finding that Schmid could perform his previous work as a courier and lot attendant. The Court finds no basis to reverse or remand the ALJ's decision on this basis.

**VI.     RECOMMENDATION**

For the reasons set forth above,

IT IS RECOMMENDED THAT:

1.      Plaintiff's Motion for Summary Judgment [Docket No. 16] be **DENIED**; and

2.      Defendant's   Motion   for   Summary   Judgment   [Docket   No.   21]   be
**GRANTED**.

Dated:          February 10, 2012

                                        *s/ Janie S. Mayeron*
                                        JANIE S. MAYERON
                                        United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by
filing with the Clerk of Court, and serving all parties by **February 24, 2012**, a writing
which specifically identifies those portions of this Report to which objections are made
and the basis of those objections.  A party may respond to the objecting party's brief
within ten days after service thereof.  All briefs filed under this Rules shall be limited to
3500 words.  A judge shall make a de novo determination of those portions to which
objection is made.  This Report and Recommendation does not constitute an order or
judgment of the District Court, and it is therefore not appealable directly to the Circuit
Court of Appeals.